STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY D. NEDROW (CABN 161299)
SUSAN KNIGHT (CABN 209013)
Assistant United States Attorneys

150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5061
FAX: (408) 535-5066
Email: Jeff.Nedrow@usdoj.gov
       Susan.Knight@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-00603-002 BLF |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | DATE: November 8, 2022 |
| DONALD OLGADO, | TIME: 9:00 a.m. |
| Defendant. | COURT: Honorable Beth Labson Freeman |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND .....................................................................................................................2

    A. Factual Background ........................................................................................................2

    B. Procedural Background ................................................................................................. 7

III. DISCUSSION .........................................................................................................................8

    A. Applicable Law ............................................................................................................. 8

    B. The Guidelines Calculation In The PSR ........................................................................8

    C. The Government's Objection to the PSR .......................................................................9

    D. The Government Requests a Two-Level Variance Under 18 U.S.C.§ 3553 ..........................10

    E. The Defendant's Objections to the PSR .......................................................................11

IV. SENTENCING RECOMMENDATION .................................................................................14

    A. Section 3553(a) Factors .................................................................................................14

        1. The Nature and Circumstances of the Offense, Including its Seriousness ............14

        2. The Nature and Circumstances of the History of the Defendant .........................15

        3. Deterrence ...............................................................................................................15

V. CONCLUSION......................................................................................................................16

# TABLE OF AUTHORITIES

**Federal Cases**

Page(s)

*United States v. Carty,* 520 F.3d 984 (9th Cir. 2008) ................................................................ 8

*United States v. Rivera*, 411 F.3d 864 (7th Cir. 2005) ............................................................. 12

*United States v. Tadios*, 822 F.3d 501 (9th Cir. 2016) ............................................................ 12

*United States v. Valle*, 940 F.3d 473 (9th Cir. 2019) ................................................................ 9

**Statutes**

18 U.S.C. § 1832(a)(3) ........................................................................................................... 1, 7

18 U.S.C. § 1832(a)(5) ............................................................................................................... 7

18 U.S.C. § 3553 .................................................................................................................. 1, 10

18 U.S.C. § 3553(a)(2) ............................................................................................................... 8

18 U.S.C. § 1834 ........................................................................................................................ 7

18 U.S.C.A. § 3553(a) .......................................................................................................... 8, 16

18 U.S.C.A. § 3771 .................................................................................................................. 12

U.S.C. § 3553(a)(2) .................................................................................................................... 8

U.S.C.A. § 3553(a) .................................................................................................................... 8

**Rules**

U.S.S.G. 2B1.1(b)(1)(I) .................................................................................................. 8, 12, 14

U.S.S.G. 2B1.1(b)(14) ................................................................................................. 1, 8, 12, 13

U.S.S.G. 2B1.1(b)(14)(A) ..................................................................................................... 9, 12

I.     INRODUCTION

In the Fall of 2012, Defendant Donald Olgado, an experienced executive at Applied Materials (AMAT), intentionally downloaded, without AMAT authorization, approximately 16,546 AMAT CAD drawings that comprised 98 percent of the AMAT MOCVD tool known as "NLighten." Defendant did not access the drawings for an authorized AMAT purpose; he downloaded the drawings for his own use in starting a competing company called Envision, which he planned to initiate with other former colleagues from AMAT. It was an extraordinary act of betrayal for someone who had worked at the company, at times in a supervisory capacity, for two decades. Defendant now stands convicted after a jury trial of eleven counts of Possession of Stolen Trade Secrets, in violation of 18 U.S.C. § 1832(a)(3) and (2), and stands before the Court for sentencing on November 8, 2022. Pursuant to Criminal Local Rule 32-5(b), the United States respectfully submits this memorandum to discuss the applicable United States Sentencing Guidelines ("U.S.S.G.") calculations and to advise the Court of its sentencing recommendation.

The parties disagree on the application of the Guidelines in this case. Specifically, as further explained below, Defendant objects to a substantial portion of the Presentence Report ("PSR"), including virtually the entire factual basis presented at trial, and the loss calculation. Defendant's objections are meritless and should be uniformly overruled. The United States Probation Office has calculated that the defendant's Guidelines range is 41 to 51 months based on a total offense level of 22. After considering 18 U.S.C. § 3553 factors, the PSR recommends a sentence of 18 months' imprisonment, three years of supervised release, and a $7,500 fine.

The government concurs with the Probation Officer's Guideline calculation with one exception: the Guidelines calculation should include a two-point enhancement for transmission of the trade secrets outside of the United States pursuant to U.S.S.G. § 2B1.1(b)(14). With this two-point enhancement, Defendant's total offense level is 24 with a Guidelines range of 51 to 63 months. However, the government further requests that the Court grant a two-level downward variance to recognize Defendant's voluntary return of AMAT property after AMAT filed for a temporary restraining order in Santa Clara County Superior Court against Defendant and his Envision associates in December 2012. A two-level downward variance results in a Guidelines range of 41 to 51 months imprisonment,

identical to the ultimate recommended Guideline range as determined in the PSR.

  Defendant's conduct in stealing thousands of trade secrets from AMAT was egregious and brazen. In emails, Defendant mocked his former employer and openly discussed the need for care and secrecy with his Envision associates. When confronted by AMAT counsel, he lied about it. Defendant has shown zero remorse for his conduct. Defendant has continued to refuse to acknowledge his culpability in the face of the jury's eleven guilty verdicts. Given the seriousness of the crime and Defendant's utter failure to take responsibility, the government respectfully recommends a Guidelines sentence of 41 months' imprisonment followed by three years of supervised release and a $7,500 fine.

## II. BACKGROUND

### A. Factual Background

  The government appreciates that the Court is well versed in the facts of this case from the 2021 trial and the extensive post-trial litigation. The government highlights the following facts from the PSR and trial testimony as most pertinent for the Court's consideration at sentencing.

  AMAT, headquartered in Santa Clara, California, supplies equipment, services, and software to enable the manufacturing of semiconductor chips for electronics, flat panel displays for computers, smartphones, televisions and solar products. PSR, ECF No. 495 ("PSR") ¶ 7.

  On November 30, 1992, Defendant was hired at AMAT and eventually became the Managing Director of Engineering within the Product Business Group. When he was hired, he signed an employee agreement which stated, in part "all inventions, copyrightable works and confidential information… produced, conceived, made or first actually reduced to practice by me solely or jointly with others during the periods of my employment at Applied… are hereby assigned to Applied and shall be the exclusive property of Applied." Furthermore, the agreement stated that the defendant shall not "disclose [a trade secret of third parties] to others or … use it for the benefit of anyone other than for Applied or such third party." PSR ¶ 8; *see also* Ex. 254-00099-0102. After Defendant's conduct in stealing AMAT trade secrets came to light, Defendant was involuntarily terminated from the company on January 25, 2013. PSR ¶ 8.

  Liang Chen was employed at AMAT as the Corporate Vice President and General Manager of the Alternative Energy Products division. He was employed by AMAT from May 1995 to October 31,

2012. PSR ¶ 9. Wei-Yung Hsu was employed at AMAT as the Vice President and General Manager within the Semiconductor LED division. He was employed from July 2000 through December 4, 2012. PSR ¶ 10. Robert Ewald was employed at AMAT as a Director of the Energy and Environmental Systems within the Alternative Energy Products division. He was employed from January 2000 through November 2012. PSR ¶ 11.

The technology at issue in the case involved the development of metal organic chemical vapor deposition (MOCVD) technology in AMAT's semiconductor tool known as NLighten. PSR ¶ 14. NLighten developed, among other unique features, automatic LED chambers in the semiconductor process, and was active from 2010 through March 2012. PSR ¶ 14. AMAT's work in this area was called Project Neon, and later Project Paragon. AMAT invested six years and over $100 million to use "pieces of the Applied Materials technology portfolio" to try and "make better LEDs and make them cheaper." Trial Tr. 293:14-21; 22-25 (testimony of Mark Pinto); *see also*, Trial Tr. 542:11-17 (testimony of Mark Splinter that the NLighten technology was an application of AMAT's core technology, known as Centura).

In March 2012, Mark Splinter, CEO of AMAT at the time, shut down the project because "the return on investment wasn't as good as other product lines, the long term opportunity we didn't think was as good for other areas in the company." PSR ¶ 14; *see also* Trial Tr. 544-545:1-3.

From March through June 2012, Chen was tasked with finding potential buyers or investors for the MOCVD technology developed in NLighten. PSR ¶ 14. Chen was told not to disclose trade secrets, but to attempt to sell NLighten at a high level. The goal was to find potential options for commercializing MOCVD technology and processes, whether that be to a separate company, and/or licensing the technology and processes. Chen reported to management about one proposal he received from a venture capitalist, but after AMAT management heard the proposal on June 20, 2012, Chen was told to stop looking for investors. PSR ¶ 14. Thereafter, on July 20, 2012, Chen presented a proposal whereby he would run a separate company ("Newco") and would license the MOCVD technology and processes and would pay AMAT up to $8 million for the right to use the technology. PSR ¶ 17. Splinter rejected the proposal and declared he no longer wished for AMAT to pursue the option of a spinout business. PSR ¶ 17. He did not support the spinout because "there was a huge amount of I.P.

3

(intellectual property) in the Centura platform and the ESS team and the NLighten team got to use that I.P. to enhance and speed up their . . . development." Trial Tr. 546:18-25.

Chen was thereafter told he needed to separate himself completely from all activities related to the MOCVD technology and processes. PSR ¶ 18. In October 2012, AMAT learned Chen intended to form a new company, Envision, that would be built upon NLighten and Paragon technology. PSR ¶ 18. The defendant, Ewald, and Hsu planned on joining the company after they left AMAT. PSR ¶ 18.

In December 2012, through Defendant's compliance with an agreement to return AMAT materials in connection with AMAT's application for a temporary restraining order, AMAT examined email correspondence between Defendant and Chen, Hsu, and Ewald. PSR ¶ 12; Ex. 187 (Stipulated Temporary Restraining Order, Evidence Preservation Order, and Order Temporarily Staying Litigation Between Plaintiff and Donald Olgado Dated December 17, 2012). The emails revealed that as early as July 2012, Chen and Defendant were attempting to secure funding for the MOCVD technology and processes. PSR ¶ 18. Defendant sent an email to Chen and Jeff Hagen, an investment banker, wherein they all agreed to have lunch and discuss AMAT's MOCVD business. PSR ¶ 18. Hagen was an investment banker with Canaccord Genuity, based in Shanghai, People's Republic of China. PSR ¶ 18. Notably, this was two weeks after Chen was told AMAT that he was no longer interested in pursuing the idea of selling or licensing the technology. PSR ¶ 18.

In September 2012, Chen sent an email to Defendant and Hsu about Envision wherein he discussed salaries, registration of their new company, and patents. PSR ¶ 19. Defendant responded and noted that he had purchased computer-aided design (CAD) software. He wrote, "My problem is the paper trail and conflict of interest with AMAT." PSR ¶ 19.

On September 22, 2012, Defendant emailed Chen, Hsu, and Ewald, and noted his expectation that he was to be reimbursed for the $40,000 spent on CAD software. PSR ¶ 20. Defendant added that he needed "to step up efforts to get this work done off the office system." Hsu replied, attaching a Power Point presentation about MOCVD bearing Applied Materials trademark that also had on two pages "Applied Materials Confidential." PSR ¶ 20. On September 27, 2012, Defendant emailed Chen, Hsu, and Ewald, stating: "Just to highlight the exposure risk. I've been working through demo licenses and getting this set up and getting quotes. Most of the computer guys, software guys came back and ask me

4

if it's related to AMAT – even though I never used AMAT email or reference anywhere. After asking – they all have databases. So I have to ask then to keep it under wraps. So we need package… tick..tick…tick." The package he was referring to appears to have been a separation package offered by AMAT to select employees, which would have aided Defendant in leaving Applied. PSR ¶ 21.

On October 9, 2012, Defendant emailed Chen to discuss downloading the technology onto a USB drive, and stated that AMAT's software had apparently blocked him. PSR ¶ 22. Defendant stated: "Tough last few days. AMAT push software that stops you from using and usb storage. My USB drive also crashed, might not be a coincidence. I have to recover these files or I'm hosed. I will look for a recover company tomorrow . . . I will have to figure out how to get around it. Maybe setup a FTP site. It will be very slow. I need to get some hackers. The CAD package is also having a lot of problems importing stuff. I need to talk to them tomorrow. This is a big problem, I really don't want to go to the 12K software." PSR ¶ 22. Shortly after the above email was sent, Defendant emailed Chen that he had submitted a request "for exception to this USB thing. It should go to you. Please approve." PSR ¶ 22. Defendant stated that he was "holed up" in his basement, and that he would "raise holy hell" about the USB issue if he was not already leaving AMAT.  PSR ¶ 23. On October 22, 2012, Defendant emailed Chen that he had figured out a way to circumvent AMAT's restriction against downloading technology onto a USB drive. PSR ¶ 24. In part, he stated: "I have a solution by connecting my NAS and resetting the windows network to my network I can get files off. These guys are pathetic. So if anyone wants to pull stuff off, let me know." Thereafter, Defendant downloaded thousands of files, as demonstrated by an analysis of the DVD's provided by Defendant, which showed the files were created in the last few days of October 2012. PSR ¶ 24; *see also* Ex. 4 (timeline of downloading of CAD files). In late October, Defendant discussed with Chen the purchase and installation of SolidEdge CAD software to use at Envision, apparently for the purpose of working with the misappropriated AMAT drawings. PSR ¶26. Defendant also informed Chen he was still attempting to recover all of the AMAT files he had attempted to download onto the USB drive. PSR ¶ 26.

On November 8, 2012, Defendant and Ewald, copying Chen and Hsu, discussed options for managing the misappropriated AMAT CAD drawing files. Defendant wrote: "NLighten BOM [Bill of Materials] I tried to download yesterday. It crashed but not before spitting out 25,000 lines of excel."

5

PSR ¶ 27. The following day, Defendant emailed Chen and Hsu: "I have all the Nlighten and paragon (sic). Exported the top level assembly . . . The problem with this is I need a BOM to use as a map so that I can navigate the sea of random part numbers in the directory. Most of this week is figuring out how to export that BOM." PSR ¶ 28. Defendant also stated that "Barring any surprises, I expect the BOM (Bill of Materials) export to take about 1-2 weeks, but after the 1st week, translation and assembly can start moving. I would then estimate that I need between 2-3 weeks before we have a stable base to start designing from . . . ." Trial Ex. 145A-0002. On November 19, 2012, Defendant emailed Chen, "You should have seen an email for sharing google (sic) drive folder. I've set up a structure that mimics the NEON master layout and want to put the BOMs in the same order." PSR ¶ 29.

In November and December 2012, Defendant, with the assistance of lower-level engineers, continued to download thousands of confidential CAD drawings containing AMAT's trade secrets from the company's confidential Teamcenter engineering database. PSR ¶ 30. In December 2012 alone, Defendant created and downloaded thousands of CAD drawings in violation of Applied policy. PSR ¶ 30.

Defendant took active steps to conceal his involvement in the conspiracy to steal AMAT's trade secrets, and affirmatively enlisted the assistance of subordinate employees to assist him. For example, on December 9, 2012, Defendant instructed a lower-level engineer to return to AMAT a plasma showerhead for the MOCVD tool, which the engineer had previously taken to Defendant's storage locker at his direction. PSR ¶ 31. Defendant later instructed the same engineer and others assisting him to delete all emails to and from Defendant related to downloading of files from the Teamcenter database. PSR ¶ 31. Trial testimony also demonstrated that Defendant enlisted the assistance of other subordinate engineers in downloading information from AMAT. *See* Trial Tr. 1308:5-20; 1315-1318 (Kollata testifying about complying with Defendant's request to download Bill of Materials from the Teamcenter database to a Google drive and to communicate using personal email accounts.); Trial Tr. 1549:19-24; 1551-1553 (Lu testifying about complying with Defendant's request to download Bill of Materials, 3D models, and other items from the Teamcenter database.).

In total, Defendant possessed 16,546 unique files on eleven DVDs that comprised 98 percent of the parts necessary to build the NLighten semiconductor tool. PSR ¶ 32. Applied Materials' engineer

6

Brian Burrows testified at trial about his methodology comparing the files on the DVDs to the files in Teamcenter (the confidential database where Applied maintained their drawings). PSR ¶ 32. After eliminating duplicate files, he determined that there were 16,546 unique files. Burrows further testified that Defendant had almost all of the 3D and 2D data, and with that information, he could have built the tool "without very much effort." PSR ¶ 32; *see also* Trial Tr. 2250:12-17 (Burrows).

### B.     Procedural Background

On November 30, 2017, a grand jury in the Northern District of California returned an Indictment charging Defendant, Liang Chen, Wei-Yung Hsu, and Robert Ewald with one count of Conspiracy to Commit Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(5) (Count One) and eleven counts of Possession of Stolen Trade Secrets, in violation of 18 U.S.C. §§ and Aiding and Abetting, in violation of 18 U.S.C. 1832(a)(3) and (2) (Counts Two through Twelve). The Indictment included a forfeiture provision pursuant to 18 U.S.C. §§ 1834 and 2323.  PSR ¶ 1.

On August 24, 2021, Defendant was convicted after a jury trial of Counts Two through Twelve. PSR ¶ 2. The jury acquitted Chen on Counts Two through Twelve, and there was a mistrial as to Count One. PSR ¶ 5. The jury acquitted Hsu and Ewald of Count One. PSR ¶ 5. On August 17, 2021, the Court granted Hsu and Ewald's motion for judgement of acquittal and dismissed Counts Two through Twelve as to Hsu and Ewald. PSR ¶ 5, *see also* ECF Nos. 370, 379, 380. On August 27, 2021, the Court granted the government's motion to dismiss Count One of the Indictment as to Defendant and Chen. PSR ¶¶ 2, 5; *see also* ECF No. 386.

On January 6, 2022, the Court granted the defendant's motion for acquittal on Counts Two, Three, Five, Six, Seven, Nine, Eleven and Twelve, and denied a motion for acquittal on Counts Four, Eight, and Ten. PSR ¶ 2; *see also* ECF No. 415. Both the government and the defendant filed motions for reconsideration of the Court's Order. *See* ECF Nos. 421-1, 432, 434, 425-1, 433, 435, 457, 455-1. On June 30, 2022, the Court granted the government's motion for reconsideration, and reinstated Defendant's convictions on Counts Two, Three, Five, Six, Seven, Nine, Eleven, and Twelve. PSR ¶ 2; *see also* ECF No. 459.  Defendant thus stands before the Court for sentencing on eleven counts of possession of trade secrets based on the jury's guilty verdicts.

## III. DISCUSSION

### A. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id*. After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in 18 U.S.C.A. § 3553(a). *Carty*, 520 F.3d at 991–93. Under 18 U.S.C.A. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (5) the need to provide restitution to any victims of the offense.

### B. The Guidelines Calculation in the PSR

The United States concurs with the United States Probation Office's calculation of the Guidelines in the PSR, with the exception, as discussed below, that the calculation should also include a two-point enhancement for transmission of the trade secrets outside of the United States pursuant to U.S.S.G. 2B1.1(b)(14). The base offense level is 6 under U.S.S.G. 2B1.1(b)(1), and sixteen-level enhancement under U.S.S.G. 2B1.1(b)(1)(I) applies because the offense involved a loss of at least $1,500,000 but less than $3,500,000. PSR ¶¶ 49-50. This highly conservative loss amount was provided by the victim company, AMAT, based on the number of years and percentage of time a number of AMAT engineers invested in developing the trade secrets contained in the CAD drawings, multiplied by their salaries. *See* AMAT's Victim Impact Statement at 5; *see also*, U.S.S.G. 2B1.1(b) cmt. n. 3(C)(ii)

(providing that, in making a reasonable estimate of the loss, the sentencing court may look to the cost of developing trade secret information). Defendant is not entitled to any reduction for acceptance of responsibility. The government agrees that Defendant's Criminal History Category is I. PSR ¶ 61. These guideline calculations result in a total offense level of 22, with a range of 41-51 months in light of Defendant's criminal history category.  PSR ¶ 100.

### C. The Government's Objection to the PSR

The government requests that the Court include a two-point enhancement for the transmission of trade secrets outside of the United States under Guideline § 2B1.1(b)(14)(A) to the Guidelines calculation because Defendant "knew or intended that the trade secret would be transported or transmitted out of the United States." U.S.S.G. 2B1.1(b)(14)(A). The government must prove facts supporting a sentencing enhancement by a preponderance of the evidence. *See United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019). Here, there is ample evidence to apply this enhancement. First, there is no doubt that Defendant knew that Liang Chen was looking for investors in China for his start-up company. *See*, *e.g.,* Ex. 108B (9/20/12 email from Chen to Olgado confirming trip to Shanghai and "waiting for four more investors confirmation, already confirmed 2 investors."); Ex. 116B-001 (10/10/12 email from Chen to Olgado and Hsu informing them that he "was going to Beijing to get a lead investor, one way or the other."); Ex. 123C-0001 (10/20/12 email from Chen to Olgado, Hsu and Ewald informing them that "[t]he Guangzhou trip was good. The decision makers were eager. They were impressed with the business plan, and how I made the Guangzhou's local equipment supplier look weak compared to ours. I am now feeling good about getting govnt (sic) funding as (sic) grant, not diluting equity.").

Second, Defendant downloaded the CAD drawings in order to produce drawings for the startup, and his name was listed on an Envision business plan listing him as Vice-President of Product Engineering. *See, e.g.,* Ex. 94A (9/6/12 email from Chen to Olgado and Hsu tasking Olgado to come up with preliminary layout for startup's MOCVD tool as soon as possible); Ex. 140D (11/3/12 email from Ewald to Chen, Hsu and Olgado asking Olgado for "MQW/pGaN chamber 3D drawing"); *see also* Ex. 104 (9/17/12 email from Olgado to Ewald sending CAD drawing for startup); Trial Tr. at 8282:2-10;18-25; 3283:1-5 (testimony of defense expert David Breitstein confirming Ex. 104 contains an NX CAD

9

drawing); Ex. 167-40 (9/26/12 Envision business plan listing the defendant as Vice President, Product Engineering).

Third, Liang Chen testified at trial that the startup's manufacturing and assembly would be based in China while the headquarters and engineering design would be based in the United States, specifically, Silicon Valley. Trial Tr. at 2737:16-25; 2738:1.

These facts support the conclusion that Defendant "knew or intended" that the stolen CAD drawings would be used to create blueprints for manufacturing the Envision product in China.

All of these facts weigh in favor of applying the two-level enhancement, which results in a total offense level of 24 with a Guidelines range of 51 to 63 months of imprisonment.

### D. The Government Requests a Two-Level Variance Under 18 U.S.C.A. § 3553

The government requests that the Court grant a two-level variance to account for Defendant's initial affirmative cooperation in returning items to AMAT pursuant to the December 2012 civil lawsuit filed by AMAT against Defendant, Liang Chen, Wei-Yung Hsu, and Robert Ewald in state court seeking damages and injunctive relief for misappropriation of trade secrets and related claims. *See* No. 112CV237790. AMAT sought an evidence preservation order and a temporary restraining order preventing them from accessing, using, disclosing, or retaining Applied data or property and requiring them to return any such property. On December 17, 2012, Defendant stipulated to the TRO and agreed to return various materials. *See* Trial Tr. at 1106-1110:1-5 (testimony of FBI Special Agent Ann Trombetta); *see also* Ex. 187 (Stipulated Temporary Restraining Order, Evidence Preservation Order, and Order Temporarily Staying Litigation Between Plaintiff and Donald Olgado Dated December 17, 2012).

Although the Court denied the application, Defendant was the only individual involved in the lawsuit who voluntarily complied with the order, returning most of the AMAT property in his possession. *See* Trial Tr. 1111-1124:1-5; *see also* Ex. 3 (12/19/12 letter from defendant's counsel to Applied Materials accompanying returned items), Ex. 154 (12/27/12 letter from defendant's counsel to Applied Materials responding to questions), Ex. 155 (1/7/13 letter from defendant's counsel to Applied Materials accompanying additional returned items). The returned items included eleven DVDs

containing over 16,000 trade secret CAD files, and emails with Chen, Hsu and Ewald from Defendant's personal email account which were ultimately introduced at trial in this case.

The government believes that is appropriate to recognize that Defendant returned Applied Materials' valuable intellectual property at an early stage in the civil proceedings with a small variance. Without Defendant's compliance, Applied Materials may not have learned the extent of the theft of their trade secrets and efforts by Defendant, Chen, Hsu and Ewald to form a competing venture.

### E. The Defendant's Objections to the PSR

The Probation Officer notes that "defense counsel submitted a lengthy objection letter wherein they objected to most of the offense conduct, noting repeatedly alleging that the presentence report was incomplete and inaccurate." Addendum to the PSR at p. 26. Defendant's effort to wish away the facts elicited at trial, and demonstrating his guilt, should be rejected. The government concurs with the Probation Officer regarding the six objections listed in the PSR:

i.  *Objection No. One*: Defendant objects to the sentence in Paragraph 17 in the draft report (now Paragraph 18 in the final report) stating that Defendant planned on joining Envision as of October 2012. Defendant claims that, as of December 2012, he was still considering remaining at Applied Materials. The government agrees with the Probation Officer that the sentence accurately states "In October 2012, Applied learned Chen intended to form a new company, Envision, that would be built upon NLighten and Paragon technology." PSR ¶ 18. The evidence demonstrates that Defendant actually intended to join Chen's startup as early as October 2012. *See, e.g.*, Ex. 167-40 (9/26/12 Envision business plan listing the defendant as Vice President, Product Engineering), PSR ¶¶ 19-29 (miscellaneous emails showing the defendant's involvement in the formation of the startup).

ii. *Objection No. Two*: Defendant objects to the Paragraphs 29 and 30 in the draft PSR (Paragraphs 30 and 32 in the final report) because those paragraphs characterize the "thousands" of CAD drawings as trade secrets. They also claim that there was insufficient evidence to show that any of the drawings of the eleven Applied Materials' parts listed in the Bill of Particulars were trade secrets. They further object to the Probation Officer quoting Applied Materials' engineer Brian Burrows testimony that the defendant could have built the semiconductor tool "without much effort."

This simply is an effort to deny the trial testimony and the jury's guilty verdicts. Defendant was

convicted of eleven counts of possession of stolen trade secrets and has filed exhaustive post-trial motions, all of which have carefully considered by the Court and rejected. He cannot now ask the Court to reexamine the sufficiency of the evidence concerning the counts of conviction. *See United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005) ("Once the jury has spoken, its verdict controls unless the evidence is insufficient or some procedural error occurred; it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt.").

Furthermore, the Probation Officer accurately quoted the testimony of Brian Burrows, and therefore, it should remain in the Paragraph 32. When asked about the significance of the 98 percent figure, Burrows responded: "I think it tells you that, you know, you had most of what you needed – you had almost all of the 3D and 2D data available, almost all of it. So you could most certainly, with not much effort, you could build one of these tools with this data." Trial Tr. 2250:12-17. There is thus support for the Probation Officer's finding on this issue.

iii. *Objection No. Three*: The defense objects to the entirety of the victim-impact section of the PSR in Paragraphs 34 to 40. The government concurs with the Probation Officer that the victim-impact statement should remain in the report. Defendant's effort to prevent the corporate victim of his criminal conduct form being heard at sentencing is baseless and should be rejected. By law, victims have a right to be heard at sentencing about the impact of the criminal offense on them. *See* 18 U.S.C.A. § 3771 (West).

iv. *Objection No. Four*: Defendant objects to the inclusion of an enhancement for loss, alleging that there was no actual or intended loss in the case. The government agrees with the Probation Officer that a 16-level enhancement for loss is warranted.

Under § 2B1.1, the Court is instructed to increase the base offense level based on the amount of "loss." U.S.S.G. 2B1.1(b). "Loss" is defined as the "greater of actual loss or intended loss." *Id*. § 2B1.1 cmt. n. 3. "Actual loss," which is involved in this case, means the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. at § 2B1.1 cmt. n.3(A)(I). Harm is reasonably foreseeable if the "defendant knew or, under the circumstances, reasonably should have known, [that the harm] was a potential result of the offense." *Id.* § 2B1.1, cmt. n.3 (A)(iv).

12

The calculation of the amount of loss need only be a "reasonable estimate of loss, given the available information." *United States v. Tadios*, 822 F.3d 501, 503 (9th Cir. 2016) (citation omitted); see also U.S.S.G. § 2B1.1, n.3(c) ("The Court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence."). The Guidelines permit a loss calculation based on the fair market value of the stolen trade secrets or the costs incurred by AMAT in developing the stolen trade secrets:

> (i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.
>
> (ii) In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

U.S.S.G. § 2B 1.1 cmt. n.3 (C)(i), (ii).

Here, the Court heard from numerous AMAT executives about the value of the stolen technology. *See, e.g.* Trial Tr. 293:24-25 (Pinto testifying that AMAT invested six years and over $100 million to develop the MOCVD NLighten technology); Trial Tr. 886-887 (Dickerson testifying that the "in-situ cleaning technology, the heating technologies, the gas delivery, there's so many things that are in these types of platforms that can be used in other technologies that are worth billions of dollars for Applied Materials."). The Court also heard Liang Chen's testimony that he was willing to pay AMAT millions of dollars to license the MOCVD technology. Trial Tr. 2907:17-21 (Chen confirming in response to a question that he was "willing to pay millions of dollars to license the MOCVD technology).

Furthermore, by stealing AMAT's trade secrets, Defendant inflicted significant harm on the company. As detailed in AMAT's Victim-Impact Statement, Defendant "put at risk Applied's valuable MOCVD technology as well as the Company's core technology on which its MOCVD platform was based. . .. If Applied had not discovered Mr. Olgado's theft, the potential damage to Applied would have been immeasurable. To this day, Applied cannot be sure whether CAD drawings or other information stolen by Mr. Olgado ended up in the hands of customers, vendors, competitors, or hackers, either domestic or foreign, or the full extent to which Mr. Olgado compromised Applied's trade secrets."

The harm to AMAT is plain. Rather than advocate for a loss based on the fair market value of the

trade secrets, AMAT calculated their losses as $2,742,784 based on small portion of their development costs from 2006 through 2009. In support of their calculation, AMAT submitted a chart detailing the percent of time employees spent on developing the stolen MOCVD CAD drawings and multiplied it by number of years and average compensation of the employees. The government concurs with this conversative approach and urges the Court to adopt a 16-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(I), loss of at least $1,500,000 but less than $3,500,000.

v. *Objection No. Five*: Defendant objects to the inclusion of the forfeiture provisions in Part D at Paragraphs 113 and 114. The government concurs with the Probation Officer and will defer to the Court whether Part D should remain in the PSR because the government is not seeking forfeiture in this case.

vi. *Objection No. Six*: Defendant objects to Part E, Factors That May Warrant Departure, at Paragraph 121, wherein the Probation Officer noted that she "has not identified any factors that would warrant a departure from the applicable guideline range." There is no basis for a downward departure from the sentencing guidelines based on the Guidelines' definition and framework regarding guideline departures.

## IV. SENTENCING RECOMMENDATION

### A. Section 3553(a) Factors

The relevant Section 3553(a) factors support a sentence within the guideline range. A guideline sentence of 41 months is appropriate under either the government's or the Probation Office's guideline calculations in this case. The government respects the thoughtful and considered 18-month sentencing recommendation of the United States Probation Office, including the Defendant's strong employment history and dedication to his family, but respectfully disagrees that a downward variance from the applicable guideline range as determined by the Court is an adequate sentence in this case given the severity of the conduct. The government submits that these factors support a sentence at the low end of the guideline range of 41 months imprisonment.

#### 1. The Nature and Circumstances of the Offense, Including its Seriousness

Defendant's conduct involved a deliberate and sustained effort to steal thousands of CAD drawings from AMAT over a period of several weeks in late 2012. The trade secret theft would likely

14

have gone undetected had the victim company not initiated civil proceedings in the case. The theft was a planned and calculated undertaking by Defendant and his associates. Defendant and his associates took steps to both conceal the theft and to circumvent AMAT security provisions. Defendant even pressed subordinate AMAT employees to assist him in the theft, conduct which both reflects his efforts to engage in a cover-up and demonstrates his indifference for the impact of his conduct might have on less experienced work colleagues who likely lacked the resources and security Defendant had earned through is years at AMAT. Defendant also directly lied to AMAT officials and counsel when asked about his conduct. This was not a crime of opportunity; it was a purposeful effort to extract as many trade secrets from the company as possible.

### 2. The Nature and Circumstances of the History of the Defendant

Defendant will argue that his prior professional accomplishments and lack of criminal history mitigate against a guideline sentence. The government acknowledges and respects Defendant's achievements prior to his involvement in the crime in this case. But these factors are simply not sufficient to justify a significant variance below the guidelines. As noted above, Defendant's scheme was calculated and spanned a number of weeks. When challenged by AMAT, he provided them with false statements. Defendant is undoubtedly a person with skills and intellect. He chose, however, to apply that considerable intellect to scheme to steal the "crown jewels" of the NLighten program from AMAT, knowing full well the damage that would be caused through such a theft. Defendant betrayed the trust of a company that had made him a successful and wealthy individual, and in doing so displayed tremendous indifference to the hard work of the employees who had trusted him.

### 3. Deterrence

Defendant presents a risk of recidivism. Defendant has displayed zero remorse for his conduct and maintains his innocence in the face of the jury's eleven guilty verdicts. Rather than acknowledge any wrongdoing, Defendant ignores the emails he personally sent which confirm his involvement in taking the drawings, and continues to falsely assert that the drawings were taken with something in mind other than the idea of starting a new company. Without any indication of remorse or an acceptance of responsibility, the government can only assume Defendant would engage in this conduct again if given the opportunity. A significant term of incarceration is warranted in order as both specific deterrence, as

well as for the general deterrent effect on others who might choose to steal trade secrets from their employer.

For all of these reasons, the government recommends that the Court impose a sentence of 41 months of imprisonment.

## V. CONCLUSION

With full consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court sentence Donald Olgado to 41 months of imprisonment, 3 years of supervised release, and the $7,500 fine recommended by Probation. The $1,100 special assessment is mandatory. Finally, Applied Materials is not seeking restitution in the criminal case and will pursue it in the pending civil lawsuit. PSR ¶ 34.

DATED: 11/1/22

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

*/s/ Susan Knight*

SUSAN KNIGHT
JEFFREY D. NEDROW
Assistant United States Attorneys